**LEE PUBLICATIONS, INC., Publisher of The Sentinel and P.J. Browning, Publisher of The Sentinel, and The Patriot–News and Cate Barron**

v.

**The DICKINSON SCHOOL OF LAW of The Pennsylvania State University Association, and The Board of Governors of The Dickinson School of Law of the Pennsylvania State University Association, Appellants.**

Commonwealth Court of Pennsylvania.

Argued March 3, 2004.

Decided April 23, 2004.

Jack M. Stover, Harrisburg, for appellants.

Niles S. Benn, York, for appellees, Lee Publications, Inc. and P.J. Browning.

Craig J. Staudenmaier, Harrisburg, for appellees, Patriot–News and C. Barron.

Before: COLINS, President Judge, and SMITH–RIBNER, Judge.,
PELLEGRINI, Judge, LEADBETTER, Judge, COHN, Judge.

OPINION BY Judge COHN.

■ The Dickinson School of Law of The Pennsylvania State University Association (Association) and The Board of Governors of The Dickinson School of Law of the Pennsylvania State University Association (Board of Governors),[1] appeal the order of the Court of Common Pleas of Cumberland County granting a motion for a preliminary injunction filed by Lee Publications, Inc., Publisher of *The Sentinel* and P.J. Browning, Publisher of *The Sentinel,* and *The Patriot–News* and Cate Barron (jointly Newspapers). The trial court determined that the Board of Governors was an "agency" as that term is defined in the Sunshine Act, 65 Pa.C.S. §§ 701–716(Act).[2] Accordingly, the trial court directed the Board of Governors to comply with the provisions of the Act, and, of particular importance here, allow public attendance at its upcoming meetings, thus giving the Newspapers access to what were previously private meetings of the Board of Governors. The Association and the Board of Governors ask us to determine whether the trial court's holding, that the Board of Governors is an "agency" of the Pennsylvania State University (PSU) because it is a committee, and therefore subject to the provisions of the Act, is an error of law.

The case arises out of the merger of The Dickinson School of Law (Dickinson), an independent, private, non-profit corporation, with PSU. The merger occurred as part of a multi-step process, after which Dickinson ceased to exist as a separate entity and became a part of PSU.

As the first part of this process, Dickinson and PSU entered into an Affiliation Agreement and Agreement and Plan of Merger (Merger Agreement), which was negotiated at arms length by the parties, and approved by both schools' Boards of Trustees on January 17, 1997. Pursuant to the Merger Agreement, PSU and Dickinson agreed, *inter alia,* to uphold certain continuing covenants. (Merger Agreement, § 4.06). Because the Dickinson Board of Trustees, along with Dickinson School of Law, would be merging into PSU, the entities sought a means that would enable them to enforce these covenants into perpetuity. Therefore, the Dickinson Board of Trustees agreed to form a separate corporation, the Association, which would continue to exist after the merger; therefore, the Association, through its Board of Governors, would be able to enforce these covenants into perpetuity.[3] As the second part of this process, the Merger Agreement also provided for a period of "affiliation" between Dickinson and PSU beginning July 1, 1997. During this period, the law school changed its name to "The Dickinson School of Law of the Pennsylvania State University," and amended its articles of incorporation to form a non-stock, single-member, Pennsylvania non-profit Corporation, with PSU designated as the single-member. (Merger Agreement, § 1.01(A) and (B)). As the third part of this process, on June 23, 2000, the parties filed the Articles of

---

**1.** The Association and the Board of Governors will jointly be referred to as the Board of Governors, unless otherwise necessary in the opinion.

**2.** The purpose of the Sunshine Act is to provide citizens with an opportunity to observe the deliberation, policy formulation and decision-making processes of public agencies. 65 Pa.C.S. § 702; *see also Press–Enterprise, Inc.*

*v. Benton Area School District,* 146 Pa. Cmwlth. 203, 604 A.2d 1221, 1225 (1992) (citing Section 2 of the Act of July 3, 1986, P.L. 388, formerly 65 P.S. § 272 re-enacted and consolidated by the Act, § 272, predecessor to § 702).

**3.** *See* Testimony of Joanne Judge, Esq., N.T. 111.

Merger and the merger became effective July 1, 2000 (Merger Date). At that time, pursuant to Section 1.02(A) of the Merger Agreement, Dickinson merged with and into PSU, and ceased to exist as a separate entity. In addition, pursuant to Section 1.02(E) of the Merger Agreement, the Board of Trustees of Dickinson formed the Association as follows:

> 1.02 *The Merger.* At the Effective Time of the Merger (as defined in Section 1.02(B)):
>
>   &ast;  &ast;  &ast;
>
> (E) *The Dickinson School of Law of The Pennsylvania State University Association.* Effective as of the Merger Date, the Board of Trustees of Dickinson shall cause to be formed a new non-stock, non-membership Pennsylvania non-profit corporation to be named "The Dickinson School of Law of The Pennsylvania State University Association" (the "Association"). The term of its existence shall be perpetual. In accordance with Section 4.13(C), the Association shall be governed by a self-perpetuating Board of Governors....

(Emphasis added). Section 4.13(C) of the Merger Agreement, entitled *"Association Governance,"* provided that the Dickinson Board of Trustees would become the Association's Board of Governors:

Effective as of the Merger Date, Dickinson's Board of Trustees will be irrevocably appointed as a self-perpetuating Board of Governors of a newly-created non-stock, non-membership, nonprofit corporation, The Dickinson School of Law of The Pennsylvania State University Association (the "Association"). The Association will be governed by then-existing Class I and Class II Trustees of Dickinson as a self-perpetuating Board of Governors.[4] The Board of Governors shall provide counsel and guidance to Penn State with respect to the operation and academic mission of The Dickinson School of Law of The Pennsylvania State University....

(Footnote added). Section 4.13(C) describes numerous responsibilities of the Board of Governors. Specifically, the Board of Governors possesses the "authority to enforce by specific performance in accordance with Section 8.09 of [the Merger Agreement], Penn State's continuing covenants which survive the Merger."[5] (Merger Agreement, § 4.13(C)(9)). Of primary importance here, is the covenant described in Section 4.06(B): that PSU will not change the name of the school from "The Dickinson School of Law of the Pennsylvania State University" nor the school's primary location from Carlisle.[6] On June

---

4. Article Three of the Bylaws of the Board of Governors establishes a method for selection of future members. PSU is not involved in this process.

5. Section 8.09 of the Merger Agreement provides, in pertinent part:

> *Specific Performance.* The parties hereto acknowledge and agree that remedies at law for breach or threatened breach of any provision of this Plan would be inadequate. In recognition of this fact, the parties hereto agree that the covenants and agreements set forth in this Plan shall be enforceable by either party (and, after the Merger Date, by the [Association] acting through its Board

of Governors) through specific performance, temporary or permanent injunctive relief and other equitable relief....

6. The parties agreed to other covenants in the Merger Agreement including the following: Section 4.06(A)—PSU will continuously offer, solely by and through Dickinson, a fully accredited J.D. based legal education, and will offer an LL.M. based legal education, continuing legal education, and J.D. or LL.M. joint degree programs; Section 4.06(C)—at the affiliation date, Dickinson graduates will become PSU alumni; Section 4.06(D)—the Board of Governors has the authority to confer honorary degrees following consultation with PSU's President.

1, 2000, before the Merger Date, the Dickinson Board of Trustees filed the Articles of Incorporation for the Association. Thereafter, the newly formed Association possessed the authority to enforce the continuing covenants, including PSU's promise that the school's primary location would remain in Carlisle, unless otherwise agreed.

This controversy began when the Board of Governors scheduled a private meeting for November 21 and 22, 2003, during which the possibility of relocating the Law School's main campus from Carlisle to University Park in State College, Pennsylvania was to be discussed.[7] (N.T. 53–54). On November 20, 2003, Lee Publications, Inc. and P.J. Browning, as publishers of *The Sentinel,* filed a complaint in equity and a motion for a preliminary injunction addressed to the original jurisdiction of this Court, brought under and pursuant to the Sunshine Act, seeking either to stop the November 21st meeting from occurring, or open the Board of Governors' meeting to the public.[8]

On November 21, 2003, the day the meeting was to begin, a preliminary injunction hearing was held before this opinion writer. Following testimony and argument,[9] the Court held that the Newspapers had not, at that time, met the test for a preliminary injunction and, so, denied the Newspapers' Motion and granted the Board of Governors' oral Motion to Dismiss.[10] The Board of Governors then held its scheduled private meeting on November 21 and 22, 2003. Following the meeting, the Chairman of the Board of Governors appointed members to four ad hoc committees created for the express purpose of considering and investigating different alternatives for relocation of the Law School.[11] (N.T. 21, 26, 56).

The Board of Governors scheduled its next meeting for February 7, 2004. A member of the Board of Governors, G. Thomas Miller, Esquire, testified that, at the February meeting, the four ad hoc committees would present the information they had gathered. He also testified that it was his intention to call for a vote at the meeting so the Board of Governors could

---

7. Phillip McConnaughay, Dean of the Law School, an *ex officio,* non-voting member of the Board of Governors, authored a memorandum, dated November 4, 2003, suggesting that the Board of Governors consider relocating the campus of the law school to University Park. (N.T. 49, 51, 54).

8. *The Patriot–News* and Cate Barron successfully moved to intervene in the proceedings on November 21, 2003. PSU was added as a defendant after the action commenced.

9. The Court assumed jurisdiction for the limited purpose of deciding the issues before it. *See Aitkenhead v. Borough of West View,* 40 Pa.Cmwlth. 547, 397 A.2d 878 (1979) (holding that if preliminary objections raise a question of the court's jurisdiction, the judge must make a threshold inquiry into the jurisdictional issue incident to decide whether to grant or deny the preliminary injunction); *see also Village Charter School v. Chester Upland School District,* 813 A.2d 20 (Pa.Cmwlth.2002) (noting that the Court's consideration of jurisdiction for the purpose of deciding the application for preliminary injunction is not a final determination of the Court).

10. The writer did not file a written opinion, but stated her reasons on the record. The Newspapers did not appeal the decision and voluntarily discontinued the action on December 8, 2003.

11. According to the testimony of witnesses, one committee was to investigate the possibility of making a physical change or alteration to the current campus of the Law School. Another committee was to look into relocating the Law School somewhere else within the local Carlisle area, and a third committee was to investigate the possibility of relocating to University Park in State College. The fourth committee was set up to research funding and strategic planning for the Law School. (N.T. 21–22, 56).

make its decision about whether to agree that the school could be relocated out of Carlisle. (N.T. 27).

In anticipation of this meeting, on January 23, 2004, the Newspapers filed a Complaint and a Motion for a Preliminary Injunction in the Court of Common Pleas of Cumberland County.[12] The Newspapers claimed that both the Association and the Board of Governors are "de facto committees" of PSU and, as such, are "agencies" for purposes of Section 703 of the Act, 65 Pa.C.S. § 703. Accordingly, the Newspapers asserted that the Association and its Board of Governors must open their meeting to the public in accordance with the provisions of the Act.[13] The trial court issued an order scheduling a preliminary injunction hearing for January 29, 2004.

Following the hearing,[14] the trial court issued an opinion and order granting the injunction. The trial court determined that the Board of Governors is a committee of PSU and, therefore, an agency as defined in the Act. It ordered that the Board of Governors comply with provisions of the Act, and specifically enjoined it from conducting any future meetings except in accordance thereto.

The Association and the Board of Governors appealed the trial court's order to this Court.[15] This Court granted the application for an expedited review of their appeal by order entered February 10, 2004. On March 3, 2004, the Court heard argument *en banc.*

■ In reviewing an appeal from an order granting or denying a preliminary injunction, we apply an abuse of discretion standard. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 828 A.2d 995 (2003). "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the [trial court]." *Roberts v. Board of Directors of School District of City of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975).

The Association and the Board of Governors argue that the trial court erred when it held that the Board of Governors is an agency subject to the provisions of the Sunshine Act because it is a "committee" of PSU. The Newspapers argue that the

12. In this proceeding, the Newspapers sued the Association and the Board of Governors, but not PSU or its Board of Trustees.

13. Section 704 of the Act provides that "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public" except in certain specified circumstances, which are not relevant here. 65 Pa.C.S. § 704.

14. The parties presented testimony and evidence at the hearing. The Newspapers presented two witnesses: G. Thomas Miller, an attorney in private practice in Camp Hill, Pennsylvania, and a member of the Board of Governors, testified for Lee Publications, Inc. (N.T. 14–15), and, Phillip McConnaughay, Dean of the Law School since July, 2002, and *ex officio*, non-voting member of the Board of Governors, testified on cross-examination for

P.J. Browning. (N.T. 49, 54). The Association and Board of Governors presented three witnesses: Joanne Judge, an attorney with Stevens and Lee, who served as counsel for the Law School for purposes of negotiating the affiliation and merger (N.T. 102–03); Hubert X. Gilroy, an attorney and currently a member of the Board of Governors (N.T. 114–15); and, Steven MacCarthy, Vice President of University Relations of PSU (N.T. 122–23). The Association and Board of Governors presented evidence, including copies of the Affiliation Agreement and Agreement and Plan of Merger (D–1), Articles of Incorporation (D–2), Articles of Merger (D–3), Bylaws of the Board of Governors (D–4), and the Charter, Bylaws and Standing Orders of PSU (D–5).

15. The parties have not appealed the trial court's determination that it had original jurisdiction over this matter.

Association and the Board of Governors "are effectively vested with exclusive authority to render advice and make binding decisions affecting [PSU] and its academic unit, the Law School," and, thus, are the equivalent of a committee of PSU. (Appellees' Brief at 15).

Section 703 of the Act defines "agency", in pertinent part, as follows:

> The body, and all committees thereof authorized by the body to take official action or render advice on matters of agency business, of all the following: ... the boards of trustees of all State-related universities....

65 Pa.C.S. § 703 (emphasis added). PSU is a state-related university and, as such, the Board of Trustees of PSU is explicitly included in the definition of an "agency" in Section 703 of the Act, and is "the body" noted in the definition. (Trial Court Op. at 9).

In an issue of first impression, the trial court concluded that the Board of Governors was also subject to the terms of the Sunshine Act as a committee of PSU. The trial court came to its conclusion after determining that the Board of Governors functioned as described in common dictionary definitions of the term "committee". The court also found the terminology included in the Act's definition of "agency"— as "committees" being "authorized by the body to take official action or render advice"—most significant. (Trial Court Op. at 10). The court noted that the Board of Governors' functions would have been within the exclusive realm of the PSU Board of Trustees "had those Trustees not specifically delegated them to the Board of Governors under the terms of the Merger Plan." (Trial Court Op. at 11). It also

concluded that, as a result of that delegation, the Board of Governors acts like a "committee" of the Board of Trustees of PSU and, therefore, is considered an agency under the Sunshine Act and, thus, must comply with its provisions.

■ We are constrained to disagree with the trial court because, after careful review, we do not believe the Board of Governors is a "committee" of PSU within the meaning of the Sunshine Act.[16]

As previously noted, the Sunshine Act defines "agency" as: "The **body,** and all **committees thereof** authorized by the body to take official action or render advice on matters of agency business ..." (emphasis added). It is undisputed that the "body" in the case *sub judice* is the Board of Trustees of PSU. Therefore, for the Act to apply, the Board of Governors must be a "committee thereof"—a committee *of* the Board of Trustees of PSU.

The legislature specifically used the word "committee" in its definition of agency. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature as expressed by the *words employed.*" *Elite Industries, Inc. v. Pennsylvania Public Utility Commission,* 574 Pa. 476, 832 A.2d 428, 431 (2003) (quoting *Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 532 A.2d 325, 331 (1987)) (emphasis added). Therefore, if possible, we must construe a law to give effect to all provisions *so that all words have meaning* and none are treated as surplusage. *Colodonato v. Consolidated Rail Corporation,* 504 Pa. 80, 470 A.2d 475 (1983) (emphasis added).

---

16. The Court is mindful that the decision regarding the location of the Law School is of great public interest and, if the existence of public interest were the test to bring an entity within the Sunshine Act, clearly, the Board of Governors' meetings discussing this issue would be within the Act. However, that is not the test.

There is no definition of "committee" in the Sunshine Act. However, there is a definition of committee of a non-profit corporation in Pennsylvania's Nonprofit Corporation Law (NCL), 15 Pa.C.S. §§ 5301–5997(NCL). Appellate courts in Pennsylvania have considered PSU to be analogous to a nonprofit corporation chartered for educational purposes. *See Pennsylvania State University v. County of Centre,* 532 Pa. 142, 149–150, 615 A.2d 303, 307 (1992) (discussing the status of the school for the purpose of performing tax assessment and the imposition of taxes on PSU's property). Section 5731(a) of the NCL, 15 Pa.C.S. § 5731(a), establishes that a committee of a nonprofit corporation's governing board may only be created and may only perform functions as specified by the governing board or its bylaws.[17]

The governing board of PSU is the Board of Trustees.[18] For the Board of Governors to be a committee of PSU's Board of Trustees under the NCL, it would have to be created by a resolution of the PSU Board of Trustees, include one or more members of the PSU Board of Trustees in its membership, and have power delegated by a resolution of the PSU Board of Trustees or the PSU Corporate Bylaws. Because the Board of Governors has none of these features, it cannot be a committee of the Board of Trustees of PSU pursuant to the NCL.

We next look at the committee structure of PSU for guidance in determining whether the Board of Governors possesses the *qualities* of a "committee of PSU." PSU's Corporate Bylaws set out the manner in which the Board of Trustees of PSU creates committees.[19] PSU has three Standing Committees[20] whose members are appointed and/or removed by the Chairman of the Board of Trustees of PSU. (N.T. 125–27; PSU Corporate Bylaws, Article 4, §§ 2 and 3). The Bylaws also provide for the existence of Special Committees, whose members are appointed by the Chairman of the Board of Trustees of PSU in consultation with the President of the University. There are no Special Committees in existence at the present time. Two standing subcommittees, whose members are selected by the Chairman of the PSU Board of Trustees, were established pursuant to Standing Orders.[21]

The salient features of all committees and subcommittees of PSU are: (1) the

**17.** Section 5731(a) of the NCL provides, in pertinent part:
  (a) **Establishment and powers.**—Unless otherwise restricted in the bylaws:
(1) The board of directors [of a corporation] may, by resolution adopted by a majority of the directors in office, establish one or more committees to consist of one or more directors of the corporation.
(2) Any committee, to the extent provided in the resolution of the board of directors or in the bylaws, shall have and may exercise all of the powers and authority of the board of directors ...
  15 Pa.C.S. § 5731(a).

**18.** The Board of Trustees is comprised of 32 members: 5 sit *ex officio;* 9 are elected by the Alumni Association; 6 are elected by agricultural societies; 6 are elected by the Board of Trustees itself; and, 6 are appointed by the Governor of Pennsylvania. (Steven J. Mac-Carthy, N.T. 125; PSU Corporate Charter C–2 and C–3).

**19.** *See* Article 4 of PSU's Corporate Bylaws, entitled "Committees of the Board of Trustees."

**20.** Membership on these committees is for a term of one year, although members can be reappointed for multiple years. The three Standing Committees of the Board of Trustees are: the Committee on Educational Policy; the Committee on Finance and Physical Plant; and, the Committee on Campus Environment. (PSU Corporate Bylaws, Article 4, § 2(b)).

**21.** The standing committees include a nominating committee and a subcommittee on architect/engineer selection.

members are members of the Board of Trustees of PSU; (2) the members are appointed by the Chairman of the Board of Trustees of PSU; (3) they exist· at the pleasure of PSU's Board of Trustees, and the Board of Trustees can eliminate them at any time; (4) the PSU Board of Trustees and the President of the University collaboratively develop agendas for all meetings; and (5) pursuant to PSU Standing Order VIII, they must advertise and hold meetings open to the public, with special accommodations provided to the press. (Standing Orders, S–6 and S–7).

In the instant case, the Board of Governors does not possess the qualities of a committee of PSU formed under Article 4. First, it is not composed of members of the Board of Trustees of PSU. Rather, the Board of Governors was formed from the Board of Trustees of the former Dickinson School of Law. (Merger Agreement, § 4.16(C)). Second, its members cannot be appointed or removed by the Board of Trustees of PSU, its Chairman, or the President of the University. Rather, the membership of the Board of Governors is self-perpetuating pursuant to the Merger Agreement and the Association's incorporation documents. (Merger Agreement, § 4.16(C); Articles of Incorporation of the Association, Article 7). Third, activities of the Board of Governors are not controlled by PSU; the university cannot eliminate the Board of Governors or the Association, has no input into the scheduling of its meetings, and does not control the content or creation of agendas for such meetings.

Nonetheless, the Newspapers argue that the Board of Governors is a "de facto" committee, or the equivalent of a committee and, therefore, comes within the definition of the Act. They assert, and the trial court agreed, that we are to look to the dictionary definition of committee for guidance as to whether the Board of Governors

comes within the definition of the Act and, therefore, would be subject to its provisions.

We agree that the legislature did not intend its use of the word "committee" in the definition of "agency" in the Sunshine Act, to be so narrowly construed as to allow public agencies to frustrate the purpose of the Act. However, the legislature has specifically used the words "*committees thereof* authorized by the body," and did not use broader language such as "*any group of people* authorized by the body" or "*any entity* authorized by the body." We must give effect to the legislature's words.

The dictionary defines "committee" as "a body of persons delegated to consider, investigate, take action on, or report on some matter." *Merriam–Webster's Collegiate Dictionary* 231 (10th ed.2001). The term "delegate" used in the definition means "to entrust to another"; "to appoint as one's representative"; or, "to assign responsibility or authority." *Id.* at 304. Thus, the qualities of a "committee" derived from these definitions indicate that it would be "of PSU," and entrusted by PSU as its representative, to consider, investigate, take action on, or report. Pervasive in the meaning of committee, then, is the ability of PSU to select the committee members and the obligation of the committee members to act **on behalf of PSU** and to act **in the best interests of PSU**. We find no indications in the record that the Board of Governors acts on behalf of or in the best interests of PSU.

The authority that the Board of Governors has relative to PSU is contained in a contract, the Merger Agreement, which the Board of Trustees of PSU and the Board of Trustees of the former Dickinson School of Law negotiated at arms length as part of the merger of the University and the Law School. As described in its

Bylaws,[22] the Board of Governors has responsibility and authority to provide counsel and guidance on the Law School to PSU and its leadership.[23] Of particular interest in the case *sub judice* is the Board of Governors' ability to enforce the covenant regarding the location of the Law School. In the Merger Agreement, PSU formally agreed that it would not move the Law School without the agreement of the Board of Governors. According to the testimony of one of the Newspapers' witnesses before the trial court, Attorney Miller, this covenant was part of the price that PSU had to pay to acquire the Law School. (N.T. 45).

The record fully supports the conclusion that the Board of Trustees of the former Dickinson School of Law wanted to ensure that it would have some type of separate legal existence in order to represent its ongoing interests and concerns, and PSU agreed, pursuant to the terms of the Merger Agreement. Joanne Judge, Esquire, who represented Dickinson School of Law in connection with the affiliation and merger, and served as incorporator for the Association, testified that the Association was formed specifically to "have both standing and funding and be in a position to actually be adverse to the Pennsylvania State University." [24] (N.T. 107, 109). During the hearing before the trial court, Attorney Judge elaborated:

> [T]he Law School Trustees thought long and hard about what to do in order to make sure that those covenants were enforced in perpetuity, and negotiated with Penn State as a part of the merger agreement that they would form a separate body, one whose purposes would be to enforce the covenants even to the point of having to sue Penn State in order to enforce the covenants.

(N.T. 111).

Furthermore, PSU must still make its own decision to move the Law School, either within Carlisle or to some other location, before the Law School would actually be affected. The process of deliberations and the decision of PSU regarding movement of the Law School would be open to the public. It is true that, under the Merger Agreement, PSU cannot relocate the Law School out of Carlisle without the agreement of the Board of Governors.

---

22. *See* Section III of PSU's Corporate Bylaws.

23. The enumerated responsibilities of the Board of Governors are to:

(1) review and make recommendations on the mission of Dickinson,

(2) review and make recommendations regarding the strategic and long term capital plans for Dickinson,

(3) provide input and guidance on Dickinson's annual giving and capital campaign efforts and endowment enhancement,

(4) provide input regarding the nature and scope of the law school curriculum,

(5) provide input regarding the means by which to maintain and enhance Dickinson's reputation for academic excellence including input on class size, tuition and admissions criteria,

(6) provide input into the selection of a successor Dean,

(7) provide input into operating and capital budgets,

(8) confer honorary degrees, in consultation with Penn State's President,

(9) enforce, by specific performance, Penn State's continuing covenants which survive the merger of The Dickinson School of Law of The Pennsylvania State University with and into The Pennsylvania State University under the Affiliation Agreement and Agreement and Plan of Merger dated January 17, 1997, and

(10) designate two members of the Board of Governors as members of Penn State's Executive Committee of the Capital Campaign.

24. Pursuant to the Agreement, PSU agreed to allocate $250,000 of Dickinson's unrestricted endowment to fund any legal action by the Board of Governors necessary to enforce PSU's covenants under the agreement.

However, in determining whether or not to agree, the Board of Governors has no obligation to act in the best interests of PSU, but rather to act in the best interests **of the Association** and the interests of the alumni of the former Dickinson School of Law that it represents.

■ There is no dispute that the Association, pursuant to Section 8.09 of the Merger Agreement, and through its Board of Governors, has the authority to enforce the covenants against PSU, and to do so through litigation in court, if necessary. It is a common principle of law that one cannot sue oneself. *See Department of Transportation v. Wilkinsburg Penn Joint Water Authority,* 740 A.2d 322 (Pa. Cmwlth.1999), *petition for allowance of appeal granted and thereafter dismissed as improvidently granted,* 564 Pa. 204, 766 A.2d 334 (2001) (holding that transportation department could sue water authority for money damages because, even though both parties were instrumentality of the same commonwealth, they were not considered the same party).

The Association, as a separate and autonomous corporation, can decide to negotiate with PSU, enter into an agreement with PSU, or take legal action against PSU, based upon its own independent interests. Because the Association has a separate legal identity, and has the authority to sue PSU, it does not come within the meaning of a "committee **of**" PSU.

Furthermore, because the Association is a validly incorporated nonprofit corporation under the laws of Pennsylvania, it has certain rights and obligations. There are no allegations, and the trial court did not find, that either the Association or PSU's Board of Trustees has failed to comply

with corporate formalities since its inception, has engaged in fraudulent activity, or has attempted to defeat the Sunshine Act through the creation of the Association.[25] Therefore, this Court should not disregard the separate corporate existence of a validly incorporated nonprofit corporation.

■ The Sunshine Act should be read broadly in order to accomplish its important objective of allowing the public to witness deliberations and actions of public agencies. However, an interpretation and application of the definition of "agency" that encompasses private corporations in contractual relationships with PSU, is inconsistent with the language of the Act. An interpretation that produces an unreasonable result is contrary to the rules of statutory construction. 1 Pa.C.S. § 1922(1).

■ The General Assembly of Pennsylvania specifically used the term "committee thereof" in the statute. There is no indication that they intended to bring all independent entities that have a contractual relationship with a public body within the Sunshine Act simply because those entities have an ability to enforce contractual obligations against the public body. Were we to decide otherwise, we would impose a tremendous burden on numerous independent nonprofit corporations just because they have contractual relationships with Sunshine Act agencies. Such a decision could also implicate the constitutional rights of free association and privacy of these corporations. As well-stated in PSU's amicus brief:

> If the ability of an independent entity to enforce an obligation imposed upon Penn State under a contract is indeed a "delegation" of some aspect of Penn

25. This Court has set out factors to be considered in disregarding the corporate form: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of

corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Lumax Industries, Inc. v. Aultman,* 543 Pa. 38, 42, 669 A.2d 893, 895 (1995).

State's authority to take "official action" within the meaning of § 703, then Penn State has delegated (and so too has every other entity subject to the Sunshine Act) its authority to take official action in thousands of existing contractual arrangements.

(Amicus Brief at 7). Were we to conclude that the Sunshine Act applied here, we would be vastly expanding the reach of the Sunshine Act and would potentially eliminate the privacy of *any* entity that has a contract or advises a Sunshine Act agency.[26] There is no indication that this was the legislature's intent.

A trial court has "reasonable grounds" for granting injunctive relief where it properly finds that the prerequisites for a preliminary injunction have been satisfied. *Summit Towne Centre, Inc.*, 573 Pa. at 646, 828 A.2d at 1001. "For a preliminary injunction to issue, *every one* of these prerequisites must be established; if the petitioner fails to establish any one of them, there is no need to address the others." *County of Allegheny v. Commonwealth*, 518 Pa. 556, 560, 544 A.2d 1305, 1307 (1988) (emphasis added). To obtain a preliminary injunction, the petitioner must show that:

(1) an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;

(2) greater injury would result from refusing an injunction than from granting it, and, the issuance of the injunction will not substantially harm other interested parties;

(3) an injunction will properly restore the parties to their status as it existed prior to the alleged wrongful conduct;

(4) the activity the petitioner seeks to restrain is actionable, the right to relief is clear, and success on the merits is likely;

(5) the injunction is reasonably suited to abate the offending activity; and,

(6) an injunction will not adversely affect the public interest.

*Summit Towne Centre, Inc.*, 573 Pa. at 646–47, 828 A.2d at 1001 (citations omitted).

Because we conclude that, as a matter of law, the Newspapers have not demonstrated a likelihood of success on the merits, in that the Board of Governors is not a "committee" of PSU, they failed to establish one of the prerequisites for obtaining a preliminary injunction, as was their burden. Accordingly, we must reverse the trial court's order granting the injunction.[27]

Judge Simpson did not participate in the decision in this case.

### ORDER

**NOW,** April 23, 2004, the order of the Court of Common Pleas of Cumberland County in the above-captioned case is hereby reversed.

---

**26.** For example, Steven MacCarthy, Vice President of University Relations of PSU, testified that PSU has literally dozens of advisory boards. (N.T. 132). He noted that PSU has an extension office in every County of the Commonwealth, and all of them have advisory boards. *Id.* However, none of them conduct open meetings in accordance with the Sunshine Act. *Id.*

**27.** The Association and the Board of Governors raise two additional issues on appeal: (1) whether the trial court committed an error of law in granting pre-meeting injunction relief because a legislatively prescribed, statutory remedy exists; and, (2) whether the preliminary injunction violates the constitutional rights of the Association and the Board of Governors of free speech and assembly. However, because of our disposition, we need not discuss these other issues.

Dissenting OPINION BY Judge SMITH–RIBNER.

I respectfully dissent from the majority's decision to reverse the well-reasoned decision of the Court of Common Pleas of Cumberland County. The trial court held that The Board of Governors of the Dickinson School of Law of the Pennsylvania State University Association (Association) was a "committee" of Penn State University (Penn State), and as such the Board of Governors was an agency as that term is defined by the Pennsylvania Sunshine Act (Sunshine Act), Act of October 15, 1998, P.L. 729, No. 93, 65 Pa.C.S. §§ 701–716, and was subject to the open-meeting provisions of the Act. *See* Section 704, 65 Pa. C.S. § 704. The Association argues that the Board of Governors is a private non-profit corporation and therefore that its meetings are not open to the public.

The Dickinson School of Law merged with Penn State under a merger agreement effective July 1, 2000, and at the time of the merger, and now, Penn State was and it still is a state-aided university operating as part of the Commonwealth of Pennsylvania's system of higher education. After the School of Law merged with Penn State, the question then became whether the law school's merger with a state-aided university, under which the law school acquired specific responsibilities and powers, subjected the meetings of its Board of Governors to the Sunshine Act enacted to protect "the right of the public to be present at all meetings of agencies and to witness the deliberation, policy formulation and decisionmaking of agencies" in performing their public roles. *See* Section 702(a), 65 Pa.C.S. § 702(a); *Consumers Education & Protective Ass'n v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977).

An "agency" is defined in Section 703, 65 Pa.C.S. § 703:

*The body, and all committees thereof authorized by the body to take official action or render advice on matters of agency business, of all the following:* ... any board, council, authority or commission of the Commonwealth or of any political subdivision of the Commonwealth or any State, municipal, township or school authority, school board, school governing body, commission, *the boards of trustees of all State-aided colleges and universities,* the councils of trustees of all State-owned colleges and universities, *the boards of trustees of all State-related universities* and all community colleges or similar organizations created by or pursuant to a statute which declares in substance that the organization performs or has for its purpose the performance of an essential governmental function and through the joint action of its members exercises governmental authority and takes official action.

Section 703 defines a "meeting" as "[a]ny prearranged gathering of an agency which is attended or participated in by a quorum of the members of an agency held for the purpose of deliberating agency business or taking official action." That section further defines "official action" as "(1) [r]ecommendations made by an agency pursuant to statute, ordinance or executive order[,] (2) [t]he establishment of policy by an agency[,] (3) [t]he decisions on agency business made by an agency[,] (4) [t]he vote taken by any agency on any motion, proposal, resolution, rule, regulation, ordinance, report or order." There is no dispute that Penn State receives significant state funding and is legislatively recognized as a state-related university in the Commonwealth, that its Board of Trustees represents the "body" which is authorized to take official action or to render advice on matters of agency business and that its meetings held to deliberate upon university business or to take official action are

subject to the Sunshine Act. In its *amicus curiae* brief Penn State acknowledged that its Board of Trustees is an agency for purposes of Section 703 of the Sunshine Act because it is a state-related university.

The merger agreement provided the Board of Governors with specific responsibilities and authority pursuant to Sections 4.13 and 4.06, and they include *inter alia*: review and making recommendations to Penn State regarding the mission of the School of Law; and render advice in connection the strategic and long-term capital plans, annual giving and capital campaigns, endowments, nature and scope of curriculum, class size, tuition and admissions criteria, operating and capital budgets, selecting a successor Dean and conferring honorary degrees. The merger agreement requires Penn State to abide, into perpetuity, by certain of its covenants unless otherwise agreed to by the Board of Governors. The covenants are stated in Section 4.06 and in particular relate, *inter alia,* to the name and location of the School of Law, engagement in J.D. based legal education and conferring of honorary degrees. Penn State is specifically bound as follows:

*Name, Location and Degrees.* The name of the unit of Penn State which offers Penn State's J.D. or LL.M programs, joint degree programs with a J.D. or LL.M components shall be 'The Dickinson School of Law of The Pennsylvania State University,' and its primary location and campus shall be Carlisle, Pennsylvania. Effective as of the Affiliation Date and thereafter into perpetuity, degrees conferred shall be conferred under such name and diplomas evidencing such degrees shall so state.

*Id.,* at 4.06(B). Under this covenant, Penn State may change the name and location of the School of Law only upon majority vote of the Board of Governors.

The trial court reviewed thoroughly the merger agreement and the express powers that it conferred upon the Board of Governors and then determined that it was a committee of Penn State under the common definition of the word. Hence, because the Sunshine Act applied to the Board of Trustees' meetings it likewise applied to the Board of Governors' meetings. The court adopted Black's Law Dictionary 266 (7th ed.1999) and Webster's II New College Dictionary (1995) definitions of committee,[1] noting the most significant language in the Sunshine Act referring to committees as being "authorized by the body to take official action or render advice" regarding the body's business. Although the court found no case or statutory law specifically addressing the issue, I am persuaded by the reasoning articulated in the cases cited hereafter.

In *Patriot–News Company v. Empowerment Team of Harrisburg School District Members,* 763 A.2d 539 (Pa.Cmwlth.2000), this Court affirmed the trial court's grant of a preliminary injunction directing that all future meetings of the appellant empowerment teams, established by two local agency school districts (Harrisburg and Steelton–Highspire) to create school improvement plans, be open to the public pursuant to the Sunshine Act. The Court determined that the empowerment teams were properly classified as adhocracies or "temporary committees" of the school districts and thus that they were considered to be agencies whose meetings were subject to the Sunshine Act. In this regard, the Court concluded that the empower-

---

1. Black's Law Dictionary defines committee as a "group of people appointed or elected to consider, determine, or manage a matter" and Webster's defines the word as a "group of people delegated to perform a particular function or task."

ment teams were authorized to take official action related, *inter alia,* to identifying academic standards, revising curriculum and creating policies/procedures for assuring safe school environments. It observed that: "[i]n other words, it is Appellants who create policy and make recommendations pursuant to Act 16 [Education Empowerment Act], and the school board is, essentially, powerless to alter these recommendations in any way." *Id.,* at 545. Also significant was the fact that no course of action could be taken as to school improvement unless the empowerment teams decided first to recommend particular courses of action or policy. The Court deemed the empowerment teams in essence to be de facto school boards.

In *Hacker v. Colonial League,* 56 Pa. D. & C.4th 281 (2001), the chancellor granted a special injunction temporarily enjoining the league (unincorporated association of 12 Pennsylvania interscholastic athletic association schools) from enforcing certain rules and regulations after the chancellor found that the plaintiffs were likely to prove at a final injunction hearing that the league prescribed, adopted and sought enforcement of · rules and regulations concerning activities that cheerleaders may perform at athletic contests. Numerous high school students and their parents filed suit alleging that the league violated the Sunshine Act when it adopted the new cheerleading regulations at a closed meeting in May 2001. The legislature authorized school boards to promulgate rules and regulations governing athletic contests,

and the chancellor concluded that because the school boards empowered the league to adopt those rules and regulations it acted as an arm of the boards or as a de facto school board, *see Patriot–News Co.,* and therefore fell within the definition of agency subject to the Sunshine Act.

The foregoing cases illustrate some of the factors considered by the trial court when it reached the conclusion that the Board of Governors was a committee of Penn State and hence fell within the definition of agency under Section 703 of the Sunshine Act.[2] There is no dispute that under the merger agreement the Board of Governors had express authority to provide advice to Penn State and to make binding recommendations concerning law school curriculum and that the Board could preclude Penn State, into perpetuity, from changing the name and location· of the School of Law. While not all of the Board of Governors' meetings would be open to public scrutiny, there is no question that meetings at which the Board takes official action or renders advice on agency business should be open to the public subject to any limitations imposed under the Sunshine Act. When performing those functions, the Board is acting as an agency as that term is defined by Section 703 of the Sunshine Act. *See Patriot New Co.; Hacker.*

After reviewing the authority and powers granted to the Board of Governors under the merger agreement in conjunction with applicable definitions and the

---

2. I agree with the trial court that the right to sue to enforce any covenants that survive the merger is of no consequence when determining whether the Sunshine Act applies to the Board of Governors' meetings. I note that the right of an employee to sue its employer does not in any way diminish the employee's status as such; that the right of a servant to sue its master does not make the servant any less of a servant; that the right of shareholders to file suits against corporations does not change the plaintiffs' rights or status as shareholders; and so forth. The notion that the Board of Governors might someday become engaged in an adversarial relationship with Penn State simply fails to support the Board's contention that it is separate and independent from Penn State and cannot be classified as a committee of Penn State or otherwise excluded from coverage under the Sunshine Act.

express requirements of the open-meeting provisions of the Sunshine Act, I am convinced that meetings of the Board of Governors are subject to the open-meeting provisions of the Sunshine Act and that the trial court was correct in so holding.[3] Because the trial court correctly determined the issue in this case, I agree that it properly entered the preliminary injunction and that all of the attendant standards have been satisfied.

President Judge COLINS joins in this dissenting opinion.

**3.** I also disagree with the majority's unsupported contention that because Penn State had no ability to select the committee members, the Board of Governors cannot be deemed a committee of Penn State. To the contrary, Penn State agreed to merge with the School of Law because Penn State perceived it to be in furtherance of its long-range strategies. Penn State could have merged with a different law school or created one of its own. To that end, Penn State's voluntary act of merging with the School of Law represents Penn State's conscious selection of a "group of people" or an "entity," which Penn State authorized to act on its behalf.