The Honorable Lana Gordon State Representative, 52nd District 5820 S.W. 27th Street Topeka, Kansas 66614
Dear Representative Gordon:
You request our opinion on whether Sheltered Living, Inc. is an entity subject to the Kansas Open Meetings Act (KOMA), K.S.A. 75-4317 et seq., and the Kansas Open Records Act (KORA), K.S.A. 45-215 et seq.
Both of these Acts can apply to not-for-profit corporations under certain circumstances. The outcome is entirely dependent upon the facts surrounding the specific corporation's creation, powers, and funding. Thus, we must first examine the nature of this particular corporation.
Sheltered Living, Inc. is a not for profit corporation originally organized in 1971 to provide a small group living facility for 8-12 persons with mental retardation of developmental disabilities. Its 1971 articles of incorporation list the original incorporators, all of whom appear to have been private persons acting in a private capacity. This corporation was not created by a governmental entity or by specific legislation enacted by Kansas law makers.
The corporation's by-laws state that it "shall at all times operate as a nonprofit, nonpolitical, sectarian organization." The board of directors manages the affairs of the corporation. The original board of directors was elected by the incorporators, and subsequent boards have been elected by the voting members of the corporation, which is made up of the directors. No governmental entity has any role in the selection or election of directors. There are currently no public officials who sit on this corporation's board of directors, and we have been informed that this has always been the case. Thus, it appears that private individuals, not associated with or appointed by a specific governmental entity created and remain in control of the daily operation of this not-for-profit corporation.
Counsel for Sheltered Living, Inc. informs us that it is a community service provider, acting to provide services under the Kansas Disability Reform Act, K.S.A. 39-1801 et seq.
 "As such, all of their state and federal aid flows through a community development disability organization (`CDDO') to them under the terms and conditions of a CDDO Affiliate Agreement. The designated CDDO for Topeka, Kansas is the Topeka Association for Retarded Citizens (`TARC'). Under the terms of the CDDO Agreement, Sheltered Living provides designated services to the developmentally disabled and mentally retarded in Shawnee County, Kansas. . . . The CDDO Agreement between TARC and Sheltered Living establishes the expectations of Sheltered Living and TARC as specified in K.S.A. 39-1801 et seq., and K.A.R. 30-64-01, et seq., all applicable federal and state statutes and regulations, and formally approved Kansas Department of Social and Rehabilitation Services (SRS) policies. However, Sheltered Living operates autonomous from SRS and SRS has no authority in developing or administering Sheltered Living policies or how federal or state money paid to Sheltered Living is to be spent."[1]
The majority of funding for Sheltered Living, Inc. comes from federal or state sources, which first go to the TARC, the local CDDO. The funding sources paid to Sheltered Living, Inc. have been broken down as follows: Medicaid Funds (received by reason of providing services to clients) — 75%; Other Federal Funds (HAP Payments, HUD Management Fee Income, and Food Stamps) — 2%; State and County Funds (CDDO grant, State aid, Grant from KDOT, county mill levy) — 10%; Private Pay (Maintenance fees, tenant rent (HUD homes) and client case management fees) — 12.5%; and Miscellaneous (interest, unrestricted donations, festival of trees, and memorials) — .5%.[2] Thus, it appears that 87% of Sheltered Living, Inc.'s funding is provided by or through some governmental entity or involvement with a governmental program. However, we note that of those funds, only 10% come directly from grants or levies. The remainder appear to be largely connected with provision of services to clients who are eligible for government assistance.
We are also given the following pertinent statements of fact: "All programs and policies are designed, developed and administered by Sheltered Living"; "SRS has no input into the development or approval of Sheltered Living's budget"; "SRS reviews Sheltered Living's programs and activities every three (3) years"; "SRS does investigate claims of abuse or neglect at Sheltered Living under K.S.A. 39-1401, et seq."; "Under the CDDO Agreement, Sheltered Living is also required to: a. provide services identified in the Eligible Person-Centered Support Plan, subject to K.A.R. 30-64-25[; b]e licensed in accordance with K.A.R. 30-63-01[; h]ave an internal written training program for staff[; m]aintain documentation of the services provided in accordance with applicable laws and SRS policies[; c]omply with applicable federal and state guidelines for providing services[; and v]erify to TARC that all services provided are consistent with the Quality Enhancement and Quality Assurance Standards of K.A.R. 30-64-26 and 30-64-27."[3]
With these facts in mind, we next examine the KOMA and the KORA rules for determining if those Acts apply to a specific not-for-profit corporation.
The Kansas Open Meetings Act (KOMA) application to Sheltered Living, Inc.
Under K.S.A. 75-4318, the KOMA applies to (1) all legislative and administrative bodies, state agencies, and political and taxing subdivisions (2) which receive or expend and are supported in whole or in part by public funds. The statutory language establishes a two part test used to determine if the KOMA applies to an entity. Both tests must be met for the KOMA to apply to a not-for-profit corporation.
When applying these tests to a not-for-profit corporation, this office considers the following factors: (a) whether the corporation receives or expends public funds; (b) whether it is subject to control of governmental unit(s); and (c) whether it acts as a governmental agency in providing services or has independent authority to make governmental decisions.[4] We also note that the Kansas Supreme Court held that the KOMA did not apply to an entity which had no governmental decision making authority as to how to expend public funds, even though the entity in question worked for a governmental entity pursuant to contract and had contractually agreed to provide services.[5] Thus, receipt of public funds alone does not automatically trigger application of the KOMA. Rather, the entity in question must also somehow be subject to the control of the governmental entity and/or be acting as a governmental agency in providing governmental services.
In examining each of the prior Attorney General Opinions discussing whether a corporation was subject to the KOMA, it is apparent that in order for the KOMA to apply, there must be some degree of governmental input in creating the entity or some on-going governmental control over the entity, as opposed to general regulation of the type of business in question.[6]
Providing services to the mentally disabled is not a service that is provided only by the government. Rather, the fact that K.S.A. 39-1801 etseq. even exists and regulates the conduct of private entities points to the fact that this type of service may be provided by non-governmental entities.
The facts presented in connection with Sheltered Living, Inc. indicate that this not-for-profit corporation was created by private citizens to provide services to other private citizens, that it remains an entity whose daily operations are entirely controlled by private citizens, and that the only source of governmental control that has ever been exercised results from contractual terms or governmental regulation of this particular type of service and business. While Sheltered Living, Inc. receives at least 87% of its funding from local, state or federal governmental entities, at least 75% of that amount is the result of providing services. Moreover, receipt of public funds alone is not dispositive in determining if the KOMA applies to a corporation. Thus, based upon the facts presented, it is our opinion that Sheltered Living, Inc. is not subject to the KOMA.
The Kansas Open Records Act (KORA) application to Sheltered Living, Inc.
The KORA applies to "public agencies," which is defined by K.S.A.45-217(e) as "the state or any political or taxing subdivision, or any office, officer, or agency thereof, or any other entity, receiving or expending and supported in whole or part by public funds." However, no entity is included under the KORA solely because it receives public funds in exchange for goods or services.[7] Although most private entities are not subject to the KORA, some not-for-profit corporations have been found to be subject to the Act.[8] However, as with the KOMA, not-for-profit corporations have also been found to not fall under the KORA where public funding is the only link and there is a lack of significant governmental control or ties.[9]
Cases from other states generally turn on (1) the extent of public funding, (2) whether there is a specific service provided for the funds, (3) whether the entity was created by a governmental entity or statute, and (4) whether it is providing a traditionally governmental service.[10]
As previously noted, approximately 10% of Sheltered Living, Inc.'s funds derive from grants or government levies for this purpose. The majority of funds received by this corporation appear to be paid by or on behalf of clients who are placed in this facility and who are receiving services. Moreover, it was not created by a governmental entity, nor is it controlled by a governmental entity. It is engaging in a business that may be provided by the private sector as well as by a governmental entity. Thus, it is our opinion that Sheltered Living, Inc. is not subject to the KORA.
In summary, Sheltered Living, Inc. is a not-for-profit corporation that provides group living services for special populations. It was created and is operated by private individuals. The services provided are highly regulated and the corporation receives public funds in return for providing such services to clients, however, the corporation was not created by statute or any governmental entity and it does not provide a strictly governmental service. Moreover, a majority of public funds paid to this corporation are paid in connection with services rendered to individuals who are themselves receiving public aid. Receipt of public funds alone does not subject an otherwise private not-for-profit corporation to the KORA or the KOMA. Thus, it is our opinion that Sheltered Living, Inc. is not a public agency as defined in the Kansas Open Meetings Act or the Kansas Open Records Act and therefore is not subject to these two Acts.
Sincerely,
 PHILL KLINE Attorney General of Kansas
 Theresa Marcel Nuckolls Assistant Attorney General
PK:JLM:TMN:jm
[1] Correspondence, Gregory Lee, Counsel for Sheltered Living, Inc., August 6, 2004.
[2] Id.
[3] Id.
[4] In applying these tests to various not-for-profit corporations we have reached different conclusions, based entirely upon the facts in each situation. Nonprofit corporations found subject to the KOMA: Attorney General Opinions No. 79-219 (area agencies on aging); 84-10 (Economic Opportunity Foundation, Inc.); 79-284 (McPherson Co. Diversified Services, Inc.); 87-143 (Three Rivers, Inc.); 87-188 (Cowley County Diversified Services); and 88-27 (HELP, Inc.). Nonprofit corporations found not subject to the KOMA: Attorney General Opinions No. 79-221 (private nursing homes); 80-239, 82-172 (KU and WSU Endowment Associations); 81-253 (Planned Parenthood); 82-256 (Hutchinson Cosmosphere); 85-175 (Electric Cooperative); 89-149 (Parsons Chamber of Commerce); 94-42 (K-10 Corridor Development, Inc.); 94-55 (Koch Commission); 94-107 (Kansas Venture Capital, Inc.); 94-99 (Mid-America Commercialization, Inc.); 94-93 (Consensus Estimating Group — with staff from various state agencies); 99-64 (Prairie Village Economic Development Commission), and 2001-02 (Hesston Area Senior Center).
[5] Memorial Hospital Ass'n, Inc. v. Knutson, 239 Kan. 663 (1986) (board in question is an independent entity that received public funds in exchange for providing a service.
[6] Attorney General Opinions No. 79-294 (McPherson County Diversified Services, Inc. subject to the KOMA, in part because it was required to report to the county commission concerning the handling of its funds and the types of services it provided and was carrying on an activity that would otherwise be handled by a governmental subdivision); 87-143 (Three Rivers, Inc. found subject to the KOMA, in part because its annual budget and any budget revisions were subject to SRS approval and monthly and yearly reports had to be submitted to the SRS); 87-188 (entity subject to the KOMA in part because it was organized by the Cowley County Board of Commissioners, and governed by a nine-member board of directors which was originally chosen by the county commissioners); 88-27 (Handicapped Education and Living Programs, Inc. found subject to the KOMA, in part because its board included one member from the county commission and one member from the city commission and provided programs which would otherwise have to be offered by the state or one of its political and taxing subdivisions, if they were to be offered at all); 94-55 (the Koch Commission found not subject to the KOMA in part because it did not have the authority to make governmental decisions or act for the state, but only collected information and made recommendations); 94-93 (the consensus estimating group was not a "public body" within the meaning of the KOMA, in part because it was an independent group which had no statutory authority or duties); 94-99 (the Mid-America Commercialization Corporation is not a "public body" within the meaning of the KOMA, because it is an independent body, not created or given authority by statute, and it is not subordinate to another governmental body); and 94-107 (Kansas Venture Capital, Inc. a for-profit corporation, was not subject to the KOMA, in part because it was operated and managed independently from any governmental control or supervision and was not a subordinate body to any state agency or local unit of government).
[7] K.S.A. 45-217(e)(2)(A).
[8] Attorney General Opinion No. 2001-13 found that the Finney County Economic Development Corporation was subject to the KORA, in part because it was formed primarily through the efforts of the city and county, and the governmental entities played a part in appointing its directors. Attorney General Opinion No. 94-111 concluded that a not-for-profit corporation providing mental health services was subject to the KORA because it was created by a county acting pursuant to K.S.A. 19-4001 etseq., and it was performing a traditional governmental function. Attorney General Opinion No. 88-61 stated that a not-for-profit city hospital was subject to the KORA because it was authorized by statute and created by a city.
[9] Attorney General Opinion No. 97-64 concluded that the NCAA is not subject to KORA merely because member schools pay dues in exchange for services provided by the NCAA.
[10] See, e.g., Times of Trenton Pub. Corp. v. Lafayette Yard CommunityDevelopment Corp, 846 A.2d 659 (N.J. 2004) (private non-profit corporation designated as redeveloper of municipal property was "public body" subject to requirements of the New Jersey Open Public Meetings Act (OPMA) because corporation was formed by a city to redevelop municipal property, corporation's board members were appointed by public officials, corporation issued tax-exempt municipally-guaranteed bonds, redevelopment was governmental function, and the corporation was designated as a "public trustee"); and Lee Publications, Inc. v. Dickenson School of Law,848 A.2d 178 (Pa. 2004) (board of governors of private law school that had merged with state university and which was still operating so as to enforce merger covenants was not a "committee" of state university such that its meetings were subject to the terms of the Sunshine Act; board of governors was not created by resolution of board of trustees of university, board of governors did not include members of board of trustees, board of trustees had not delegated power to the board of governors, board of governors was formed from former members of board of trustees of law school, membership of board of governors was self-perpetuating pursuant to merger agreement with university and law school association's incorporation documents, and law school association had an independent existence).